[L.A. No. 32138. Sept. 3, 1987.]

ABBOTT FORD, INC., Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
FORD MOTOR COMPANY et al., Real Parties in Interest.

**COUNSEL**

Shield & Smith and Ingall W. Bull, Jr., for Petitioner.

No appearance for Respondent.

Lillick, McHose & Charles, Gordon K. Wright, Kenneth R. Chiate, David S. Brown, Yusim, Stein & Hanger, Robert T. Hanger, Kenneth G. Anderson, Murphy, Thornton, Hinerfeld & Elson, Robert E. Hinerfeld, Timothy M. Thornton, John T. Thornton, Robert W. Rubin and Manatt, Phelps, Rothenberg, Tunney & Phillips for Real Parties in Interest.

Greines, Martin, Stein & Richland, Alan G. Martin, Adams, Duque & Hazeltine, Jerald R. Cochran, Lee Smalley Edmon and Cheryl A. De Bari as Amici Curiae on behalf of Real Parties in Interest.

## OPINION

**PANELLI, J.**—The issue presented here is whether a "sliding scale recovery agreement,"[1] entered into by plaintiffs and one of several defendants in a personal injury action, represents a "good faith" settlement within the meaning of sections 877 and 877.6 of the Code of Civil Procedure,[2] so as to relieve the settling defendant of any liability for contribution or equitable comparative indemnity to other defendants in the action. The trial court concluded that the agreement in question was not a good faith settlement and denied the settling defendant's motion to bar cross-complaints by the remaining defendants. The settling defendant then sought review by writ of mandate, and ultimately the Court of Appeal—after remand by this court—concluded that while the "good faith" of such a sliding scale agreement must properly be measured by the standard set forth in our recent decision in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159], the agreement at issue here satisfied that standard as a matter of law. We granted review to consider the question of the appropriate application of the statutory "good faith" requirement in the context of sliding scale agreements.

---

[1] Section 877.5, subdivision (b) of the Code of Civil Procedure defines "sliding scale recovery agreement" for purposes of that section as "an agreement or covenant between a plaintiff or plaintiffs and one or more, but not all, alleged tortfeasor defendants, where the agreement limits the liability of the agreeing tortfeasor defendants to an amount which is dependent upon the amount of recovery which the plaintiff is able to recover from the nonagreeing defendant or defendants. This includes, but is not limited to, agreements within the scope of Section 877, and agreements in the form of a loan from the agreeing tortfeasor defendant to the plaintiff or plaintiffs which is repayable in whole or in part from the recovery against the nonagreeing tortfeasor defendant."

As noted below, in the legal literature and in other jurisdictions such agreements are commonly known as "Mary Carter" agreements. (See fn. 9, *post.*) For convenience, we shall generally refer to such agreements simply as sliding scale agreements.

[2] Unless otherwise noted, all section references are to the Code of Civil Procedure.

I

To place the issue in perspective, we review the facts and the litigation background as revealed by the declarations and other materials that were presented to the trial court in connection with its hearing on the good faith settlement question.

The underlying personal injury action in this case arose out of a somewhat unusual automobile accident that occurred on September 10, 1981. At the time of the accident, Ramsey Sneed was driving a used 1979 Ford Econoline van that he had purchased from Abbott Ford, Inc. (Abbott). As Sneed was driving, the left rear wheel came off the van and crashed into the windshield of an on-coming car, a 1965 Mercury station wagon driven by Phyllis Smith. The windshield shattered and Smith suffered serious injuries, including the loss of sight in both eyes and the loss of her sense of smell.

Thereafter, Smith and her husband (hereafter plaintiffs) filed the underlying lawsuit against four defendants—(1) Sneed, (2) Abbott, (3) Ford Motor Company (Ford) and (4) Sears, Roebuck & Co. (Sears)—seeking recovery on a variety of theories.[3] Plaintiffs' mandatory settlement conference statement—prepared after considerable discovery—summarized the case against each defendant as follows:

(1) With regard to Sneed, plaintiffs claimed that he had been negligent in the maintenance and operation of his van, and had continued to drive the vehicle after hearing sounds indicating that there might be some difficulty with the wheels.

(2) With regard to Abbott—a car dealer which had purchased the van used, had "customized" it by replacing the original wheels and tires with "deep dish mag wheels" and oversized tires, and had then resold it to Sneed—plaintiffs sought recovery on both negligence and strict liability theories. With regard to the negligence claim, discovery revealed that Ford, the manufacturer of the van, had provided a warning in its owner's manual—which Abbott received—cautioning against the installation of "after-market wheel assemblies," like the "deep dish mag wheels," on the van. Despite the warning, Abbott had installed the customized wheel assembly, had failed to give the owner's manual or provide any other warning to Sneed, and had failed to advise Sneed of the need to retighten the lug nuts on the wheel assembly periodically because of their tendency to become loose.

---

[3] Smith's husband's cause of action against all defendants was based on loss of consortium.

(3) With regard to Ford—which had manufactured both the van and the station wagon involved in the accident—plaintiffs claimed that liability could be posited on the basis of Ford's relationship with each vehicle. With respect to the van, plaintiffs relied on both strict liability and negligence theories, suggesting that, notwithstanding the warning provided in its owner's manual, Ford should have reasonably foreseen that potentially dangerous aftermarket wheel assemblies would be installed and should have taken further steps—such as attaching a warning against such installation to the vehicle itself—to minimize the problem. With respect to the station wagon, plaintiffs alleged that a defect in the design of the windshield led it to shatter on impact by the wheel and tire, aggravating plaintiffs' injuries.

(4) Finally, with regard to Sears—which had serviced the van three months before the accident—plaintiffs claimed that while Sears' service records indicated that Sneed had neither requested nor been charged for a brake check, Sneed had in fact requested such a check and Sears' employees had either negligently replaced the wheels on the van or had negligently failed to conduct an inspection which would have revealed the looseness of the lug nuts.

In addition to these numerous claims arising out of the accident itself, plaintiffs' second amended complaint—filed in November 1982—contained three additional causes of action against Abbott alone, relating to Abbott's loss of evidence which was critical to plaintiffs' case. After the accident, the van had been towed to Abbott's place of business, and Abbott had agreed with plaintiffs' counsel that it would preserve the evidence until plaintiffs could retain an expert to examine it. When plaintiffs' counsel later attempted to obtain the evidence, however, Abbott informed him that much of the evidence had been lost. Plaintiffs then added the three additional causes of action to their complaint, alleging, inter alia, that Abbott had intentionally destroyed or lost the evidence. The trial court initially sustained Abbott's demurrer to plaintiffs' "intentional spoliation of evidence" count, relying on the fact that no California decision had previously recognized such a cause of action. Plaintiffs sought writ relief from the trial court's ruling, and the Court of Appeal ordered the trial court to reinstate the challenged cause of action, holding that the allegations of intentional spoliation would support a tort action for both compensatory and punitive damages. (*Smith* v. *Superior Court* (1984) 151 Cal.App.3d 491 [198 Cal.Rptr. 829].) Within weeks of the Court of Appeal's decision, Abbott informed plaintiffs that it had discovered the evidence that ostensibly had been lost.

With the case in this posture, a mandatory settlement conference was set for March 26, 1984. In anticipation of that conference, representatives of

Abbott, Ford and Sears met on March 14, 1984.[4] At that meeting, Abbott's counsel stated that he believed a reasonable settlement value for the case was $2.5 million and that Abbott was willing to contribute 70 percent of that sum.[5] Counsel for Ford and Sears, however, maintained that their clients had only minimal, if any, responsibility for the accident and were unwilling to bear 30 percent—$750,000—of such a settlement.

At about the same time, plaintiffs offered to settle with Ford or Sears if they would enter into a sliding scale agreement guaranteeing plaintiffs $1.5 million. Both Ford and Sears declined the offer.

On March 23, 1984, three days before the settlement conference, plaintiffs filed their "mandatory settlement conference statement" setting forth the facts of the case, their theories of liability against all parties, and their expected recovery. With respect to liability, the statement concluded: "The liability of Abbott Ford in this case is clear on either a products liability theory or on a negligence theory because Abbott Ford modified the van with unsafe, defective after-market wheels and tires notwithstanding Ford's warning to the contrary. Ford's and Sears' liability is not as clear as Abbott Ford's, but it is for the jury to decide whether they should be held accountable for this accident. The liability of Sneed is also clear because he had the last opportunity to avoid the accident." With respect to damages, the statement declared that—on the basis of a detailed review of damage awards in numerous cases involving similar injuries—"[p]laintiffs expect a favorable verdict in this case in an amount not less than $3,000,000."

Three days later, at the mandatory settlement conference, Abbott's insurer announced that it had agreed in principle to enter into a sliding scale agreement with plaintiffs, guaranteeing plaintiffs a recovery of $3 million. Several months later, plaintiffs and Abbott's insurer formally entered into the sliding scale agreement that is the focus of the present proceeding.

The agreement—which took the form of two separate contracts, one with each plaintiff, twenty-two and twenty pages in length respectively—contained three key and interrelated elements: (1) Abbott's insurer guaranteed Phyllis Smith an ultimate recovery of $2.9 million, and her husband an ultimate recovery of $100,000; if, at the conclusion of the lawsuit, plaintiffs had not collected the guaranteed amounts from the remaining defendants, Abbott's insurer would pay the balance up to the guaranteed sum. Thus, if plaintiffs recovered $3 million or more from Ford and Sears, Abbott would not bear any ultimate liability to plaintiffs; if plaintiffs recovered less than

---

[4] There was no objection at the good faith hearing to the court's consideration of evidence relating to the settlement negotiations of the parties.

[5] Abbott's liability insurance policy provided coverage of $3.25 million.

$3 million from Ford and Sears, Abbott would be obligated to pay plaintiffs the difference. In return for these guaranties, plaintiffs agreed (a) to dismiss all of their actions against Abbott and (b) to continue to prosecute their action against Ford and Sears[6] in the same way that they would have in the absence of the agreement—through appeal, if necessary—"except that [plaintiffs] shall not settle all or any portion of this litigation with defendants Ford and Sears Roebuck for less than the amount of [their] guaranty, without the express written consent of" Abbott's insurer.

(2) In addition to providing the guaranties, Abbott's insurer agreed to make substantial, periodic no-interest loans to plaintiffs and their attorneys during the course of the litigation. Under the agreement, a total of $390,000 in interest-free loans had been made to plaintiffs and their attorneys by January 1986, and Abbott's insurer was obligated to pay plaintiffs and attorneys the full $3 million—in the form of a loan—by July 1, 1987, if plaintiffs' action had not been terminated by then. The agreement provided that the loan payments would serve as credits for the insurer's obligations under the guaranty provision; if plaintiffs collected $3 million or more from Ford and Sears, plaintiffs were obligated to repay the loans in full—but without interest—to Abbott's insurer.

(3) Finally, the agreement contained an additional provision under which the insurer agreed to pay plaintiffs the full $3 million outright if the agreements were found to be invalid or not in good faith.

On August 30, 1984, a few months after the sliding scale agreement was signed, Abbott moved in the trial court pursuant to section 877.6 for an order declaring the agreement to be in good faith and dismissing all claims against Abbott for contribution or comparative indemnity. Both Ford and Sears opposed the motion, arguing, inter alia, (1) that sliding scale agreements, by their nature, cannot constitute good faith settlements within the meaning of the relevant statutes, and (2) that, in any event, the settlement agreement at issue here was not a good faith settlement because "the settlement price is potentially grossly disproportionate to Abbott Ford's fair share of the damages."[7]

On September 10, 1984, the trial court held a hearing on Abbott's section 877.6 motion. At the conclusion of the hearing, the court entered a minute

---

[6] The settlement agreements disclose that plaintiffs had previously settled their case against Sneed for $25,000, the amount of Sneed's liability insurance.

[7] In the papers filed in the trial court, Ford and Sears both conceded that if the sliding scale agreements were held not to be "good faith" settlements, and thus—by virtue of the terms of the agreements—Abbott became obligated to pay plaintiffs $3 million outright, that $3 million payment would be proportional to Abbott's fair share of the damages and would constitute a good faith settlement, absolving Abbott of any further liability to either Ford or Sears.

order denying Abbott's request to have the agreement declared a good faith settlement so as to bar Ford's and Sears' indemnity cross-complaints against it. The court's order stated that its determination was based "on the fact that Abbott Ford has not paid any amount in settlement and that the guarantee agreement does not constitute a settlement, but rather constitutes a gambling transaction."

Abbott thereafter sought review of the trial court's order in the present writ proceeding, as authorized by section 877.6, subdivision (e). The Court of Appeal issued an alternative writ and, relying on a line of Court of Appeal decisions which had interpreted the "good faith" standard of sections 877 and 877.6 to require simply that settling parties refrain from "tortious or other wrongful conduct" (see, e.g., *Dompeling* v. *Superior Court* (1981) 117 Cal.App.3d 798, 809-810 [173 Cal.Rptr. 38]), concluded that the agreement in this case was a good faith settlement as a matter of law. Thereafter, we granted a hearing and retained the matter while we considered the general question of the appropriate interpretation of the "good faith" settlement standard. In *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra,* 38 Cal.3d 488 (hereafter *Tech-Bilt*), we disapproved the lines of cases that had been relied on by the Court of Appeal in its earlier decision in this case, finding that those cases had adopted an improperly narrow view of "good faith." We concluded that "[a] more appropriate definition of 'good faith,' in keeping with the policies of *American Motorcycle [Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 (146 Cal.Rptr. 182, 578 P.2d 899)] and the statute, would enable the trial court to inquire, among other things, whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries." (38 Cal.3d at p. 499.) Thereafter, we remanded this matter to the Court of Appeal, directing the court to consider "whether and to what extent the principles enunciated in *Tech-Bilt* . . . may be applicable to an agreement of [the] type [involved in this case.]"

On remand, the Court of Appeal concluded that the "good faith" standard embodied in *Tech-Bilt* does apply to sliding scale agreements. Nonetheless, the court found that even under the *Tech-Bilt* standard the agreement at issue here constituted a good faith settlement as a matter of law. ■ ■ ■ ■ We again granted review to consider the important and difficult issues presented by the case.[8]

---

[8] While this matter was pending here, the parties informed us that the case has been fully settled. Nonetheless, noting the importance of the issue and the need for a prompt decision on the question from this court, the parties have urged us to retain the case and decide the general legal issues presented.

Past decisions make it clear that, in appropriate circumstances, we may retain and decide a case even when the particular controversy is technically moot. "There is ample precedent for

## II

■ As Ford and Sears point out, sliding scale—or, as they are more commonly known throughout the country, "Mary Carter"[9] —agreements have engendered a considerable body of academic commentary, much quite critical of this genre of settlement agreements.[10] Relying on this literature, and a few out-of-state cases (see, e.g., *Lum* v. *Stinnett* (1971) 87 Nev. 402 [488 P.2d 347]; *Trampe* v. *Wisconsin Telephone Co.* (1934) 214 Wis. 210, 218 [252 N.W. 675, 671]), Ford and Sears urge us to hold all such agreements contrary to public policy and invalid as a matter of law.

---

appellate resolution of important issues of substantial and continuing public interest which otherwise may have been rendered moot and of no further immediate concern to the initiating parties. [Citation.]" (*DeRonde* v. *Regents of University of California* (1981) 28 Cal.3d 875, 880 [172 Cal.Rptr. 677, 625 P.2d 220]; *John A.* v. *San Bernardino City Unified School Dist.* (1982) 33 Cal.3d 301, 307 [187 Cal.Rptr. 472, 654 P.2d 242].) We have concluded that it is appropriate to follow that course here.

[9] The term "Mary Carter" agreement is derived from the name of one of the earliest cases involving such an agreement, *Booth* v. *Mary Carter Paint Company* (Fla.App. 1967) 202 So.2d 8. In *Maule Industries, Inc.* v. *Rountree* (Fla.App. 1972) 264 So.2d 445, 446, footnote 1, the court observed that the term "appears to be used rather generally to apply to any agreement between the plaintiff and some (but less than all) defendants whereby the parties place limitations on the financial responsibility of the agreeing defendants, the amount of which is variable and usually in some inverse ratio to the amount of recovery which the plaintiff is able to make against the nonagreeing defendant or defendants."

Such agreements are also occasionally referred to by other terms. In Arizona, this type of agreement is generally known as a "Gallagher covenant," from the case of *City of Tucson* v. *Gallagher* (1971) 14 Ariz.App. 385 [483 P.2d 798] which dealt with such an agreement. At least one commentator has referred to such an agreement as a "guaranteed verdict agreement." (Bodine, *The Case Against Guaranteed Verdict Agreements* (1980) 29 Def.L.J. 233.) Where the agreement takes the form of a loan, it is sometimes called a "loan receipt agreement" (McKay, *Loan Agreement: A Settlement Device that Deserves Close Scrutiny* (1976) 10 Val.U.L.Rev. 231), though the "loan receipt" terminology derives from a distinct device developed in the admiralty insurance field. (See *Luckenbach* v. *W.J. McCahan Sugar Ref. Co.* (1918) 248 U.S. 139 [63 L.Ed. 170, 39 S.Ct. 53, 1 A.L.R. 1522]; see also *Bolton* v. *Ziegler* (N.D.Iowa 1953) 111 F.Supp. 516, 527.)

[10] The titles of many of the law review articles make this quite clear. (See, e.g., Bodine, *The Case Against Guaranteed Verdict Agreements, supra,* 29 Def.L.J. 233; Freedman, *The Expected Demise of "Mary Carter": She never Was Well!:* (1975) 633 Ins.L.J. 602; McKay, *Loan Agreement: A Settlement Device that Deserves Close Scrutiny, supra,* 10 Val.U.L.Rev. 231; Scoby, *Loan Receipts and Guaranty Agreements* (1975) 10 Forum 1300; Note, *Are Gallagher Covenants Unethical?: An Analysis Under the Code of Professional Responsibility* (1977) 19 Ariz.L.Rev. 863; Comment, *Gallagher Covenants, Mary Carter Agreements and Loan Receipt Agreements: Unsettling Contributions to Conflict Resolution,* 1977 Ariz.St.L.J. 117; Note, *Mary Carter in Arkansas: Settlements, Secret Agreements, and Some Serious Problems* (1983) 36 Ark.L.Rev. 570; Comment, *Blending Mary Carter's Colors: A Tainted Covenant* (1977) 12 Gonz.L.Rev. 266; Comment, *Sliding Scale Agreements and the Good Faith Requirement of Settlement Negotiation* (1980) 12 Pacific L.J. 121; Note, *The Mary Carter Agreement—Solving the Problems of Collusive Settlements in Joint Tort Actions* (1974) 47 So.Cal.L.Rev. 1393; Comment, *Mary Carter Agreements: Unfair and Unnecessary* (1978) 32 Sw.L.J. 779; Comment, *Mary Carter Agreements: A Viable Means of Settlement?* (1979) 14 Tulsa L.J. 744; Note, *"Mary Carter" Limitation on Liability Agreements Between Adversary Parties: A Painted Lady Is Exposed* (1974) 28 U. Miami L.Rev. 988.)

The majority of out-of-state decisions have, however, declined either to condemn or condone such agreements categorically (see, e.g., *Vermont Union School* v. *H.P. Cummings Const.* (1983) 143 Vt. 416 [469 A.2d 742, 749-750], and cases cited) and, for a number of reasons, we believe such a cautious approach to the problems posed by sliding scale agreements is appropriate. First, an enormous variety of contractual arrangements fall within the general rubric of sliding scale or Mary Carter agreements. Although in all such agreements the settling defendant's ultimate liability to the plaintiff is dependent, at least in part, on the amount of money which the plaintiff recovers from the nonsettling defendants, there are a virtually unlimited number of additional provisions that may be included in such agreements—for example, provisions which mandate secrecy, restrict settlement with the remaining defendants, or provide various forms of financing for the plaintiff's action—that will often substantially affect the operation and validity of the agreements.[11] These differences caution against hasty overgeneralization of the merits or demerits of sliding scale agreements as a class.

Second, in addition to the variety of provisions that may supplement the sliding scale or "guaranty" clause of such agreements, the content and effect of the sliding scale provision itself and the factual background against which the agreement is negotiated frequently vary significantly from case to case. In some cases, like this one, the sliding scale clause may be structured so that the settling party may ultimately bear no liability to the plaintiff; in other cases, the settling party may make a substantial noncontingent payment to the plaintiff, and the sliding scale element may simply provide a supplemental guaranty of some additional recovery. (See, e.g., *Dompeling* v. *Superior Court, supra,* 117 Cal.App.3d 798, 802; *Torres* v. *Union Pacific R.R. Co.* (1984) 157 Cal.App.3d 499, 503 [203 Cal.Rptr 825].)[12] In some cases, again like this one, the guaranty figure may be for an amount equal or close to the plaintiff's total damages; in others, the guaranty figure may represent only a relatively small share of the plaintiff's damages. (See, e.g., *Rogers & Wells* v. *Superior Court* (1985) 175 Cal.App.3d 545, 548 [220 Cal.Rptr. 767].)[13] In some cases, the settling defendant who may potentially be relieved of all liability by virtue of the agreement may be clearly the most culpable of all of the defendants, while in other cases a sliding scale agree-

---

[11] As one court observed: "[T]he number of variations of the so-called 'Mary Carter Agreement' is limited only by the ingenuity of counsel and the willingness of the parties to sign." (*Maule Industries, Inc.* v. *Rountree, supra,* 264 So.2d 445, 447.)

[12] In *Dompeling,* the settling defendant made a noncontingent payment of $100,000—the limits of his insurance policy—and guaranteed plaintiff up to an additional $10,000 under a sliding scale arrangement. In *Torres,* the settling defendant made a noncontingent payment of $50,000 and provided an additional $150,000 guaranty on a sliding scale basis.

[13] In *Rogers & Wells,* the settling defendants provided guaranties totaling $3.9 million; plaintiffs' claims against all defendants in that litigation exceeded $90 million.

ment may be entered into by only peripherally involved defendants in order to obtain an escape from a potentially lengthy and costly suit. (See, e.g., *Rogers & Wells* v. *Superior Court, supra,* 175 Cal.App.3d 545, 553-555.) Finally, in some cases a sliding scale agreement may be obtained by one defendant in the early stages of negotiation without regard to the willingness of other defendants to engage in settlement negotiations in good faith, while in others such an agreement may be resorted to only as a last resort, after one or more defendants unreasonably refuse to make any settlement offer that may be commensurate with their fair share of responsibility for the plaintiff's damages, thwarting a fair and complete settlement of the litigation. These differences too may have a significant bearing on the fairness and propriety of a particular agreement.

Third, and finally, a broad ruling on the inherent validity or invalidity of sliding scale agreements "in general" is inappropriate because such agreements may have a variety of effects at different stages of the litigation process—discovery, settlement, trial or appeal. The potential problems posed by a particular provision in such an agreement may call for one remedy—e.g., disclosure of the agreement to the nonagreeing parties or to the jury—in one context, and another remedy—e.g., invalidation of a specific provision, or the agreement as a whole—in a different context. Thus, analysis requires close attention to the specific provisions of the agreement itself, the factual setting in which the agreement is entered into, and the agreement's effect on the particular aspect of the judicial process at issue.

In the present case, the question before us is not the broad one of the validity of sliding scale agreements in general, but the more limited question of whether the sliding scale agreement at issue here should properly be considered a "good faith" settlement under the relevant statutory provisions so as to absolve Abbott from any liability for contribution or indemnity to the remaining codefendants, Ford and Sears. As we shall see, that issue in itself raises a number of complex questions.

## III

As we explained in our recent decision in *Tech-Bilt,* the provisions of sections 877 and 877.6[14]—governing the effect that a settlement agree-

[14] Section 877 provides in full: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—[¶] (a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; and [¶] (b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors."

ment has on a settling defendant's potential liability to other defendants for contribution or comparative indemnity—have two major goals: the equitable sharing of costs among the parties at fault and the encouragement of settlements. (38 Cal.3d at pp. 494-496.)[15] The provisions of section 877 make

---

Section 877.6 provides in full: "(a) Any party to an action wherein it is alleged that two or more parties are joint tortfeasors shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors, upon giving notice thereof in the manner provided in Sections 1010 and 1011 at least 20 days before the hearing. In addition, the notice may be served by mail pursuant to Section 1012, but in those cases the period of notice shall be at least 25 days if the place of address is within the State of California, at least 30 days if the place of address is outside the State of California but within the United States, and at least 40 days if the place of address is outside the United States. Upon a showing of good cause, the court may shorten the time for giving the required notice to permit the determination of the issue to be made before the commencement of the trial of the action, or before the verdict or judgment if settlement is made after the trial has commenced.

"(b) The issue of the good faith of a settlement may be determined by the court on the basis of affidavits served with the notice of hearing, and any counteraffidavits filed in response thereto, or the court may, in its discretion, receive other evidence at the hearing.

"(c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor from any further claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.

"(d) The party asserting the lack of good faith shall have the burden of proof on that issue.

"(e) When a determination of good faith or lack of good faith of a settlement is made, any party aggrieved by the determination may petition the proper court to review the determination by writ of mandate. The petition for writ of mandate shall be filed within 20 days after service of written notice of the determination, or within such additional time not exceeding 20 days as the trial court may allow.

"(1) The court shall, within 30 days of the receipt of all materials to be filed by the parties, determine whether or not the court will hear the writ and notify the parties of its determination.

"(2) If the court grants a hearing on the writ, the hearing shall be given special precedence over all other civil matters on the calendar of the court except those matters to which equal or greater precedence on the calendar is granted by law.

"The running of any period of time after which an action would be subject to dismissal pursuant to Section 583 shall be tolled during the period of review of a determination pursuant to this subdivision."

[15] Although several Court of Appeal opinions have suggested that there is an established "hierarchy" or "priority" to the various public policy objectives in this area that can be applied in all contexts (see, e.g., *Sears, Roebuck & Co.* v. *International Harvester Co.* (1978) 82 Cal.App.3d 492, 496 [147 Cal.Rptr. 262]; *Fisher* v. *Superior Court* (1980) 103 Cal.App.3d 434, 446-447 [163 Cal.Rptr. 47]), our decisions have never embraced any such mechanical hierarchical approach. Instead, we have generally attempted to harmonize the competing public policies, taking into account the specific context in which the potential conflict between the various policies appears. Accordingly, the fact that we have determined, in one setting, that a particular goal should properly give way to another objective, does not mean that the goal that prevailed should always "trump" the competing objective when a conflict arises between the two in a different setting. For example, while we determined in *American Motorcycle Assn.* v. *Superior Court, supra,* 20 Cal.3d 578, that the long-established joint-and-several-liability doctrine should be preserved in part because it furthered the state interest in ensuring that an injured plaintiff is adequately compensated for his loss (see 20 Cal.3d at p. 590), in that same decision we also held the injured party's interest in "maximizing" his re-

it quite clear that the two goals are inextricably linked. Section 877 establishes that a good faith settlement bars other defendants from seeking contribution from the settling defendant (§ 877, subd. (b)), but at the same time provides that the plaintiff's claims against the other defendants are to be reduced by "the amount of consideration paid for" the settlement (§ 877, subd. (a)). Thus, while a good faith settlement cuts off the right of other defendants to seek contribution or comparative indemnity from the settling defendant, the nonsettling defendants obtain in return a reduction in their ultimate liability to the plaintiff.

*Tech-Bilt* recognized that the "good faith" requirement of sections 877 and 877.6 is the key to the harmonization of the twin statutory objectives. "The good faith provision of section 877 mandates that the courts review agreements purportedly made under its aegis to insure that such settlements appropriately balance the contribution statute's dual objectives." (38 Cal.3d at p. 494, fn. omitted.) At the same time, we explained that the "good faith" concept cannot be captured in a simple formula. " 'Lack of good faith encompasses many kinds of behavior. It may characterize one or both sides to a settlement. When profit is involved, the ingenuity of man spawns limitless varieties of unfairness. Thus, formulation of a precise definition of good faith is neither possible nor practicable. The Legislature has here incorporated by reference the general equitable principle of contribution law which frowns on unfair settlements, *including those which are so poorly related to the value of the case as to impose a potentially disproportionate cost on the defendant ultimately selected for suit.*' " (*Id.,* at pp. 494-495 [quoting *River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986, 997 [103 Cal.Rptr. 498], italics added in *Tech-Bilt*].)

Rejecting the line of cases—beginning with *Dompeling* v. *Superior Court, supra,* 117 Cal.App.3d 798—which had indicated that settling parties were free "to further their respective interests without regard to the effect of their settlement upon other defendants" (*id.,* at pp. 809-810) so long as they refrained "from tortious or other wrongful conduct" (*ibid.*), we concluded in *Tech-Bilt* that "[a] more appropriate definition of 'good faith,' in keeping with the policies of *American Motorcycle [Assn.* v. *Superior Court* (1978) 20 Cal.3d 578] and the statute, would enable the trial court to inquire, among other things, *whether the amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries.*" (38 Cal.3d at p. 499, italics added.)[16] Elaborating on

covery could not justify preserving the plaintiff's control over litigation by prohibiting a defendant from joining other tortfeasors who were also responsible for damages. (See 20 Cal.3d at p. 606.)

[16]The dissent takes issue with our interpretation of the term "good faith" as it is used in section 877. According to the dissent, "good faith" under section 877 "simply requires non-

the parameters of the good faith concept, we observed that "the intent and policies underlying section 877.6 require that a number of factors be taken into account including a rough approximation of plaintiffs' total recovery and the settlor's proportionate liability, the amount paid in settlement, the allocation of settlement proceeds among plaintiffs, and a recognition that a settlor should pay less in settlement than he would if he were found liable after a trial. Other relevant considerations include the financial conditions and insurance policy limits of settling defendants,[17] as well as the existence of collusion, fraud or tortious conduct aimed to injure the interests of nonsettling defendants. [Citation.] Finally, practical considerations obviously require that the evaluation be made on the basis of information available at the time of settlement. '[A] defendant's settlement figure must not be grossly disproportionate to what a reasonable person, at the time of the settlement, would estimate the settling defendant's liability to be.' (*Torres v. Union Pacific R.R. Co.* (1984) 157 Cal.App.3d 499, 509 [203 Cal.Rptr. 825].) *The party asserting the lack of good faith,* who has the burden of proof on that issue [citation], *should be permitted to demonstrate, if he can, that the settlement is so far 'out of the ballpark' in relation to these factors as to be inconsistent with the equitable objectives of the statute. Such a demonstration would establish that the proposed settlement was not a 'settlement made in good faith' within the terms of section 877.6.*" (*Id.,* at pp. 499-500, italics added, fn. omitted.)

By requiring a settling defendant to settle "in the ballpark" in order to gain immunity from contribution or comparative indemnity, the good faith requirement of sections 877 and 877.6 assures that—by virtue of the "set-off" embodied in section 877, subdivision (a)—the nonsettling defendants' liability to the plaintiff will be reduced by a sum that is not "grossly disproportionate" to the settling defendant's share of liability, thus providing at least some rough measure of fair apportionment of loss between the settling and nonsettling defendants.

■ As *Tech-Bilt* emphasizes, of course, a "good faith" settlement does not call for perfect or even nearly perfect apportionment of liability. In order to encourage settlement, it is quite proper for a settling defendant to pay less than his proportionate share of the anticipated damages. What is required is simply that the settlement not be grossly disproportionate to the

collusive conduct" on the part of the settling parties. However, as noted above, we considered and rejected that very contention in our recent decision in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159]. We find no compelling reason to reexamine or overturn the conclusions reached in *Tech-Bilt.*

[17]For a comprehensive examination of this factor, see Roberts, *The Financial Condition and Insurance Policy Limits of a Joint Tortfeasor Wishing to Settle in Good Faith: Problems of Discovery and Confidentiality* (1986) 26 Santa Clara L.Rev. 63.

settlor's fair share. As the Court of Appeal observed in *Torres* v. *Union Pacific R.R. Co., supra,* 157 Cal.App.3d 499, 507: "If [a settling] codefendant wishes to enjoy the section 877 bar against indemnity, he must make some attempt to place the price of his settlement within a reasonable range of his relative share of the liability."

As noted above, the Court of Appeal—after remand from this court—concluded that the "good faith" standard articulated in *Tech-Bilt* applies to sliding scale agreements. Abbott has not challenged that conclusion here and, in any event, we agree with the Court of Appeal's conclusion on this point. Neither section 877 nor section 877.6 exempts sliding scale agreements from its "good faith" requirement, and nothing in section 877.5[18]—a provision which was enacted to protect against the unfair consequences that may flow from undisclosed sliding scale agreements (see, e.g., *Moreno* v. *Sayre* (1984) 162 Cal.App.3d 116, 125 [208 Cal.Rptr. 444])—indicates that such agreements need not meet the generally applicable good faith standard. Indeed, the legislative history of section 877.5 suggests that the Legislature contemplated that a broad good faith standard—as first articulated in *River Garden Farms, supra,* 26 Cal.App.3d 986—would apply to such agreements.[19]

The crucial question presented by this case is how *Tech-Bilt's* good faith standard should apply to sliding scale agreements. Ford and Sears claim broadly that sliding scale agreements can never satisfy the good faith standard of *Tech-Bilt,* asserting that such agreements, by their very nature, irreconcilably conflict with *both* goals—fair apportionment of loss and encouragement of settlement—sought to be advanced by the statutory scheme. In addition, they argue that even if some sliding scale agreements

---

[18]Section 877.5, subdivision (a) provides: "(a) Where an agreement or covenant is made which provides for a sliding scale recovery agreement between one or more, but not all, alleged defendant tortfeasors and the plaintiff or plaintiffs: [¶] (1) The parties entering into any such agreement or covenant shall promptly inform the court in which the action is pending of the existence of the agreement or covenant and its terms and provisions; and [¶] (2) If the action is tried before a jury, and a defendant party to the agreement is a witness, the court shall, upon motion of a party, disclose to the jury the existence and content of the agreement or covenant, unless the court finds that such disclosure will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury. [¶] The jury disclosure herein required shall be no more than necessary to be sure that the jury understands (1) the essential nature of the agreement, but not including the amount paid, or any contingency, and (2) the possibility that the agreement may bias the testimony of the alleged tortfeasor or tortfeasors who entered into the agreement."

Section 877.5, subdivision (b), which defines "sliding scale recovery agreement" for purposes of the provision, is quoted in full in footnote 1, *ante.*

[19]The documents considered by the relevant legislative committees referred to section 877's good faith requirement and to the application of the good faith standard in *River Garden Farms.* (See, Comment, *Sliding Scale Agreements and the Good Faith Requirement of Settlement Negotiation, supra,* 12 Pacific L.J. 121, 139.)

may properly be found to be good faith settlements, the agreements at issue here clearly cannot. We first consider the claims with respect to apportionment of loss.

## A

Ford and Sears argue initially that sliding scale agreements inevitably thwart the goal of a fair apportionment of loss among responsible tortfeasors. Because, by definition, such an agreement is one in which the settling defendant's final out-of-pocket payment to the plaintiff is dependent on the amount which the plaintiff ultimately recovers from the remaining defendants, Ford and Sears insist that such an agreement always has the effect of improperly shifting the settling defendant's share of liability onto the nonsettling defendants, thus undermining equitable apportionment. To support their claim, Ford and Sears note that under the sliding scale agreement at issue here, if a jury were to assess plaintiffs' damages from the accident at $3 million or more and to find that Ford or Sears was in any degree responsible for the injury, Ford or Sears would ostensibly be required to bear *all* of the damages, and Abbott—the party who, by all appearances, is the most culpable tortfeasor[20] —would escape any ultimate out-of-pocket loss whatsoever. Ford and Sears argue that such a result cannot be squared with the statutory goal of fairly apportioning loss among the responsible tortfeasors.

Although the scenario outlined by Ford and Sears does seem difficult to reconcile with the fair apportionment objective, a review of the facts of other cases suggests that Ford and Sears have overstated the argument in claiming that sliding scale agreements *invariably* conflict with a fair apportionment of loss. The sliding scale agreement in *Dompeling* v. *Superior Court, supra,* 117 Cal.App.3d 798, for example, required the settling defendant to pay $100,000 outright and included an additional $10,000 sliding scale guaranty; though the settling defendant's ultimate payment was thus dependent, to some extent, on the plaintiff's recovery from the nonsettling defendant, the nonsettling defendant received an offset for the $100,000 noncontingent payment and thus the agreement as a whole did not necessarily undermine a fair apportionment of loss. Similarly, although the sliding scale agreement in *Rogers & Wells* v. *Superior Court, supra,* 175 Cal.App.3d 545, provided for no noncontingent payment by the settling defendants and therefore could result in no ultimate out-of-pocket cost on their behalf, because the settling defendants in that case apparently bore only minimal, if any, responsibility for the plaintiffs' injuries, the *Rogers &*

---

[20] During settlement negotiations, it will be recalled, Abbott agreed to bear 70 percent of its proposed $2.5 million settlement, and plaintiffs' settlement conference memorandum clearly designated Abbott as the principal tortfeasor.

*Wells* court concluded that the agreement was not at odds with the fair apportionment objective.

These diverse situations reveal that the fact that a settlement agreement involves some sort of sliding scale or guaranty provision is not alone sufficient to demonstrate that the agreement is irreconcilable with the fair-apportionment-of-loss objective. Although sliding scale agreements may frequently present problems in this regard, we must proceed beyond the simple presence of a sliding scale provision and delve into the specifics of both the particular agreement and the factual background to properly assess the question.

In analyzing the apportionment problem, it is important to keep in mind that, under the terms of section 877, a settlement—if found to be in "good faith"—has *two* interrelated consequences: (1) it discharges the settling tortfeasor from all liability to other defendants for contribution or indemnity, and (2) it reduces the plaintiff's claims against the other defendants by "the amount of consideration paid for it." Although past cases have often overlooked the interrelationship of these two features (see fn. 21, *post*), in our view the ultimate analysis of the effect of the sliding scale agreement resolves itself to a consideration of fairness to the nonsettling defendants. If a court finds that a settling defendant, by entering into a sliding scale agreement, has realistically paid a "consideration" that is within its *Tech-Bilt* "ballpark," and if the nonsettling defendants obtain a reduction in the plaintiff's claims against them in an amount equal to that consideration, the statutory fair apportionment objective should be satisfied.[21] Accordingly,

[21] Past California cases involving sliding scale agreements have generally suggested that where the settling defendant has made no noncontingent payment to the plaintiff, but has simply guaranteed a certain recovery or provided a loan, no deduction from the plaintiff's claims against other defendants is warranted on the ground that "there was no amount or consideration actually paid" to the plaintiff. (See, e.g., *Pease* v. *Beech Aircraft Corp.* (1974) 38 Cal.App.3d 450, 473 [113 Cal.Rptr. 416].) Indeed, some Court of Appeal decisions have suggested that because no outright "payment" is made in such a sliding scale transaction, the agreement should not be considered a "settlement" for purposes of section 877 at all. (See, e.g., *Riverside Steel Construction Co.* v. *William H. Simpson Construction Co.* (1985) 190 Cal.App.3d 1175, 1191.) As explained below, however, we conclude that from a realistic standpoint a settling defendant does "pay" some "consideration" whenever it enters into a sliding scale agreement and that it is both proper and necessary for a trial court to assess the accuracy of the parties' valuation of consideration in determining whether the settlement is in good faith so as to relieve the settling defendant of liability for comparative indemnification or contribution. The past cases which have permitted plaintiffs to obtain the benefits of such agreements without recognizing the necessity of a corresponding reduction in the plaintiffs' claims against the remaining defendants have overlooked the relationship between the "immunity" from contribution afforded by section 877, subdivision (b) and the reduction in the plaintiff's claims against the remaining defendants provided by section 877, subdivision (a).

A number of out-of-state decisions have recognized the potential unfairness to nonsettling defendants if an offset is not permitted in this setting, and have reduced the plaintiff's claims

the analysis of whether a sliding scale agreement conflicts with the fair apportionment objective lies in "the amount of consideration" which is attributed to the settling defendant as the "payment" for his release from liability by entering into the sliding scale agreement. Since the sliding scale agreement is given by the settling defendant in exchange for the plaintiff's release and the immunity from contribution or indemnity from the claims of the nonsettling cotortfeasors, we should assume the exchange is of equivalents. If we focus, then, not on what the settling defendant gave up, but rather what he received, then we have a simple application of the *Tech-Bilt* rules. This is so because one of the principal difficulties in this area has been the attempt to arrive at an accurate evaluation of the "price" or "consideration" which has been paid by a settling defendant who enters into a sliding scale arrangement.

Unlike an ordinary settlement agreement in which the amount the settling defendant has paid—and correspondingly the amount to be deducted from the plaintiff's claims against the remaining defendants—is typically easy to identify, the contingent nature of a sliding scale obligation has created considerable confusion as to the proper valuation of such an agreement.

The parties are in sharp disagreement on this point. Ford and Sears argue that the "consideration paid" should be calculated solely by reference to the amount of any *noncontingent* payment which the settling defendant has made to the plaintiff under the agreement; in this case, where Abbott has made no noncontingent payment, they suggest that the "consideration" or cost paid by Abbott should be valued at zero. Abbott, on the other hand, points to the fact that it has guaranteed plaintiffs a $3 million recovery, and argues the consideration which it has paid should be fixed at its possible maximum payment, $3 million.

The economic reality, we believe, lies between these two extreme positions. Contrary to the arguments of Ford and Sears, a guaranty agreement, even if totally contingent, is not completely cost-free from the point of view of the guarantor. At the same time and contrary to the position of Abbott, however, the "cost" or "price" of such an agreement is not equal to the maximum amount that the guarantor may possibly be required to pay

---

against the remaining defendants by the amount of the loans or repayable "advances" that the plaintiff has received from the settling defendant. (See, e.g., *Bolton* v. *Ziegler, supra,* 111 F.Supp. 516; *Cullen* v. *Atchison, Topeka & Santa Fe Railway Co.* (1973) 211 Kan. 368, 377 [507 P.2d 353]; *Monjay* v. *Evergreen School Dist. No. 114* (1975) 13 Wn.App. 654 [537 P.2d 825].) However, for the reasons stated in this opinion, we believe that the value placed on the sliding scale agreement by the parties to the agreement—assuming it meets the *Tech-Bilt* standards—is the proper amount of set off under section 877.

under the agreement. Accordingly, given the nature of sliding scale agreements, we believe the court should not be burdened with the obligation to determine the *actual* value of such an agreement by the use of actuarial or other valuation methods. Rather, the parties to such an agreement, since they are in the best position to place a monetary figure on its value, should have the burden of establishing the monetary value of the sliding scale agreement.

In many cases, negotiations between the parties will have included a traditional "straight" settlement as an alternative to the sliding scale agreement, and this background will give the settling parties a vantage point in declaring the agreement's value. In addition, since the plaintiff and the settling defendant are likely to have somewhat different, and somewhat conflicting interests in placing a value on the agreement—the plaintiff would prefer the value to be on the low side to reduce the amount that its claims against other defendants will be reduced; the settling defendant will want the value to be high enough to assure that the agreement is found to be within its *Tech-Bilt* "ballpark" so as to relieve it of liability for comparative indemnity or contribution—requiring a joint valuation by the plaintiff and the settling defendant should generally produce a reasonable valuation. (See Comment, *California Code of Civil Procedure Sections 877, 877.5, and 877.6: The Settlement Game in the Ballpark that Tech-Bilt* (1986) 13 Pepperdine L.Rev. 823, 857.)[22]

Once the parties to the agreement have declared its value, a nonsettling defendant either (1) can accept that value and attempt to show that the settlement is not in good faith because the assigned value is not within the settling defendant's *Tech-Bilt* ballpark, or (2) can attempt to prove that the parties' assigned value is too low and that a greater reduction in plaintiff's claims against the remaining defendants is actually warranted.[23]

---

[22] Requiring the parties to a sliding scale agreement to set a value on the agreement is not inconsistent with section 877.6, subdivision (d), which provides that "[t]he party asserting the lack of good faith shall have the burden of proof on that issue"; under the proposed approach, the nonsettling defendant or defendants would still bear the burden of proving the lack of good faith. Section 877.6, subdivision (d) is not addressed to the question of who should establish the "amount of the consideration" which the settling party has paid to the plaintiff. Inasmuch as an assessment of the amount of the consideration may turn on facts within the peculiar knowledge of the parties to the agreement, it appears appropriate to place on them the burden of assigning a value to the consideration.

[23] In those cases in which the trial court is called on to assess the accuracy of the settling parties valuation of the guaranty, the court may not be able to do more than simply make its best estimate, taking into account the size of the guaranty figure and the likelihood that the settling defendant will actually have to pay out either that amount or some lesser sum. (Pollak, *Sliding Scale Recovery Agreements After Tech-Bilt* (Cont.Ed.Bar 1986) 8 Civ. Litigation Rptr. 121, 124-125 [hereafter Pollak].)

In the present case, of course, the settling parties placed no value on the sliding scale agreement. Accordingly, if the case had not been settled, we would have ordered the Court of Appeal to remand the matter to the trial court for further consideration of this issue.

### B

█ In addition to the fair apportionment issue, Ford and Sears contend that sliding scale agreements in general, and the agreement in this case in particular, should be found not in "good faith" because such agreements improperly impede the *full* settlement of the case. We pointed out in *Tech-Bilt* that "from the standpoint of the public interest and the legal process, a prime value in encouraging settlement lies in 'remov[ing] [the case] from the judicial system, and this occurs only when *all* claims relating to the loss are settled.'" (38 Cal.3d at p. 500.) Ford and Sears maintain that while the availability of the sliding scale agreement mechanism may induce the plaintiff to settle with one or perhaps a number of defendants, such an agreement effectively prevents the remaining defendants from thereafter settling with the plaintiff without a trial. Abbott responds that the availability of a sliding scale agreement often has exactly the opposite effect, and is frequently used as an incentive to persuade an otherwise recalcitrant defendant to engage in settlement negotiations in good faith and to participate with other defendants in contributing its fair share to a settlement pool that will secure the full settlement of the case. Abbott suggests that if one defendant stubbornly refuses to participate in good faith in such settlement negotiations, a sliding scale agreement may be the only means available to the other defendants to escape from the litigation without paying the portion of the plaintiff's damages that should appropriately be borne by the unyielding defendant.

Although it is somewhat paradoxical, we think there is considerable merit in both of the parties' arguments on this point. In some circumstances, the availability of sliding scale agreements can facilitate the settlement process; at the same time, particular sliding scale agreements may operate to thwart or impair the full settlement of the case. Our task is to attempt to identify the different situations, and to regulate the use of sliding scale agreements so as to further the state interest in fostering the full settlement of litigation.

---

Contrary to the fears expressed in the concurring opinion, the fact a nonsettling defendant may challenge the agreement's assigned value should not be interpreted as giving such defendant a right to a mini-trial on the valuation issue. The nature, extent and the procedure regarding any such challenge is left to the discretion of the trial court.

## 1.

■ As Abbott suggests, in some instances sliding scale agreements have been entered into only as a matter of last resort, when one defendant in a multidefendant action refuses to participate in settlement negotiations or to make a good faith offer commensurate with its fair share of responsibility for plaintiff's damages. In such a setting, the recalcitrant defendant's unyielding position may threaten to make it impossible for any of the defendants to settle the litigation with the plaintiff, because the plaintiff may be unwilling to release any of the joint-and-severally liable defendants without an assurance that he will at least recover a minimum sum which he feels is necessary to compensate him for his injuries. While a defendant is, of course, ordinarily under no "legal obligation" to enter into a settlement with the plaintiff and has the "right" to insist that the plaintiff prove its case at trial, when a defendant acts unreasonably in settlement negotiations and its action or refusal to act threatens to frustrate the good-faith settlement efforts of other defendants and the plaintiff, such a defendant may be on shaky equitable grounds when it thereafter seeks to attack the "good faith" of a sliding scale agreement that has been occasioned by its own recalcitrance. We agree with Abbott that in such a setting it is appropriate for a trial court to take into consideration the conduct of the nonsettling defendant in determining whether a sliding scale agreement is a good faith settlement for purposes of sections 877 and 877.6.[24]

At the same time, however, we think that there must properly be limits on the consequences that may be visited on a defendant who is found to have been unreasonably recalcitrant in settlement negotiations. Because it may be difficult to distinguish between defendants who unreasonably or in bad faith refuse to make a fair contribution to a settlement fund and defendants who in good faith honestly and reasonably believe that they bear no liability for a plaintiff's injury, a rule which permits settling defendants to thrust the entire economic responsibility for an injury on a single defendant through a sliding scale agreement is likely to have an unduly coercive effect on defendants who may be acting in good faith, unfairly compelling them to settle to avoid a financial disaster whenever there is any risk that their conduct might later be viewed as unreasonable. (See, e.g., *Monjay* v. *Evergreen School Dist. No. 114, supra,* 13 Wn.App. 654 [537 P.2d 825, 829].) Instead, we believe a more measured sanction is called for.

In *Tech-Bilt* we observed that in determining whether the amount of a settlement was within the good faith "ballpark," a trial court should proper-

---

[24] In evaluating the "reasonableness" or "good faith" of a nonsettling defendant's negotiating conduct, it may be particularly appropriate for the court that is making the good faith settlement determination to take into account whether the sliding scale agreement was the product of the efforts of a settlement judge.

ly recognize "that a settlor should pay less in settlement than he would if he were found liable after a trial." (38 Cal.3d at p. 499.) In a similar manner, we think that the trial court's "ballpark" determination may also appropriately be adjusted to take into account any unreasonable or bad faith conduct of a nonsettling party which may have impeded the settlement process. If the court finds that the party challenging the settlement engaged in such conduct, it may reduce the lower threshold of the "ballpark" cutoff, and find a settlement in good faith even if the "consideration" paid for, i.e., the "value" of, the sliding scale agreement is somewhat lower than the court would otherwise have found acceptable. (See Pollak, *supra,* 8 Civ. Litigation Rptr. at pp. 126-127.) Through this approach, a nonsettling defendant who unreasonably impedes settlement can be saddled with a greater portion of economic responsibility than it would otherwise have borne; the sanction, however, should not be so out of proportion to the hold-out defendant's conduct as to be unduly coercive. In this way, a court can give recognition to the positive role sliding scale agreements may have in deterring unreasonable nonparticipation in settlement negotiations.

2.

■ Ford and Sears contend, however, that even if the potential availability of a sliding scale agreement may be a valuable tool for encouraging settlement in some instances, once a sliding scale agreement is actually entered into, the agreement invariably interferes with the ability of the nonparticipating defendants to settle the remainder of the litigation. Ford and Sears argue that because sliding scale agreements necessarily have this antisettlement effect, we should find that such agreements are not compatible with the purposes of sections 877 and 877.6 and should never be accorded "good faith" settlement status under those provisions. As we explain, while the potential antisettlement effect of a consummated sliding scale agreement is a legitimate cause for inquiry and concern, we believe that the problem can be met by a remedy less sweeping than the condemnation of all sliding scale agreements.

As Ford and Sears point out, the most obvious conflict between sliding scale agreements and a subsequent settlement of the balance of the lawsuit is posed by explicit provisions contained in most sliding scale agreements which purport to grant the settling defendant a "veto power" over any subsequent settlement which would affect the settling defendant's ultimate out-of-pocket costs under the guaranty agreement. The provision contained in the agreement in the present case is fairly typical in this regard, providing that "[plaintiffs] shall not settle all or any portion of this litigation with defendants Ford and Sears Roebuck for less than the amount of [their]

guarant[eed recovery], *without the express written consent of [Abbott's insurer]."* (Italics added.)

The reason for the inclusion of some such "veto" provision in a sliding scale agreement is, of course, readily apparent. Because the settling defendant has agreed to guarantee that the plaintiff ultimately recovers some minimum amount, it "has an obvious and legitimate interest in ensuring that the plaintiff diligently prosecutes its claims against the remaining defendants." (Pollak, *supra,* 8 Civ. Litigation Rptr. at p. 127.) As Judge Pollak points out, however, the authority afforded by such contractual veto provisions frequently exceeds the settling defendant's "legitimate" interest. While it may be reasonable for the earlier settling defendant to reserve the right to veto subsequent settlements which are unfairly low and which would result in its bearing an ultimate out-of-pocket cost higher than its fair share of the plaintiff's damages, there is no similar compelling justification for permitting that defendant to bar the remaining defendants from settling with the plaintiff for an amount that is sufficiently high that it would not have such an unfair effect. (*Ibid.*) An open-ended veto provision conflicts with the public policy which favors the full settlement of litigation and may frequently result in unnecessary trials. Accordingly, we conclude that to be valid and enforceable, such a veto provision must, by its terms, be confined only to those subsequent settlements that will require the earlier settling defendant to bear more than its fair "ballpark" share of damages.[25]

Ford and Sears additionally contend that even in the absence of an express veto provision, sliding scale agreements have the inherent tendency to impair subsequent settlements and should generally be found not in good faith for that reason. All sliding scale agreements, however, do not invariably deter further settlement. The sliding scale agreement at issue in *Rogers & Wells* v. *Superior Court, supra,* 175 Cal.App.3d 545, for example, created no realistic obstacle to the full settlement of that litigation. In that case, as noted above, the sliding scale agreement was entered into by two peripherally responsible defendants and guaranteed the plaintiffs a recovery of $3.9

---

[25]That "ballpark" figure may or may not be the same as the "value" of the sliding scale agreement, depending on the specifics of the sliding scale agreement and the facts of the particular case. Although—as we have explained above—the consideration which a settling defendant pays by entering into a sliding scale agreement must at a minimum fall within the "ballpark" of its fair share of comparative liability if the settling defendant is to gain immunity from its codefendants' claims for comparative indemnity, in some cases the plaintiff may be unwilling to settle for the settling defendant's minimum ballpark figure and the parties may agree to a sliding scale agreement that is more costly to the settling defendant. In those cases, the "value" of the sliding scale agreement and the settling defendant's minimum "ballpark" figure will differ, and a veto provision may be valid even if it is pegged to a figure that differs from the value of the sliding scale agreement. As noted above, however, a settling defendant may only reserve the right to veto a subsequent settlement that will result in its bearing an unfair share of the plaintiff's damages.

million; because the total amount of the plaintiffs' claims was over $90 million and the remaining defendants were clearly the more culpable tortfeasors, the agreement was not likely to deter a subsequent settlement since it was obvious that any such settlement would greatly exceed the $3.9 million guaranty.

We recognize that some sliding scale agreements —by establishing a high guaranty figure and by mandating that the proceeds of any subsequent settlement up to the guaranty figure shall be credited in toto to the earlier settling defendant—may effectively eliminate any incentive a plaintiff has to settle with the remaining defendants, at least within a range commensurate with those defendants' fair share of responsibility. We do not decide at this time whether the potential antisettlement effect of such an agreement is sufficient, in itself, to warrant a finding that the agreement is not a good faith settlement for purposes of sections 877 and 877.6; that issue was not raised below and is not addressed in the briefs on appeal. (Cf. *In re Waverly Acc. of Feb. 22-24, 1978* (M.D.Tenn. 1979) 502 F.Supp. 1, 5, with *Bass* v. *Phoenix Seadrill/78, Ltd.* (5th Cir. 1985) 749 F.2d 1154, 1165.) We do note, however, that settling parties may be able to obviate such a challenge in the future by providing some mechanism for the sharing of subsequent settlement proceeds between the earlier settling defendant and the plaintiff, thereby assuring that the plaintiff retains at least some incentive to entertain reasonable settlement offers from the remaining defendants. (See, e.g., Pollak, *supra,* 8 Civ. Litigation Rptr. at p. 127.)

## IV

As discussed above, Abbott maintains that the sliding scale agreement in this case is not disproportionate to its fair share of liability and does not improperly impair full settlement of the action. It also apparently contends, however, that even if the agreement were found to be flawed in those respects, the agreement should nonetheless be found to be a good faith settlement within the meaning of sections 877 and 877.6 because of two additional considerations. We discuss each in turn.

### A

Abbott first emphasizes that sliding scale agreements like those at issue here—and, in particular, the no-interest loan provisions of the agreement—provide injured victims with a speedy source of revenue which enables such victims both to support themselves immediately and to litigate their claims against other defendants. It points out that a number of courts and commentators have taken note of these beneficial aspects of such agreements.

(See, e.g., *American Transport Co.* v. *Central Indiana Ry. Co.* (1970) 255 Ind. 319, 323 [264 N.E.2d 64, 67]; Comment, *supra,* 1977 Ariz.St. L.J. 117, 152.)

We agree that affording an injured person prompt payment of funds for his losses serves a very important state interest. But nothing we have said above is inconsistent with that purpose. We have not suggested that it is improper for a settlement agreement to take the form of a noninterest loan from the settling defendant to the plaintiff, repayable out of the proceeds of any recovery;[26] rather, we simply note that the value of such a loan will realistically be considered by the parties to the agreement in arriving at the agreement's value. Of course, if a plaintiff chooses to release his or her claims against a defendant for less than that defendant's "ballpark" figure, the plaintiff remains free to do so; if, however, the settling defendant wishes to obtain immunity from potential claims for comparative indemnity or contribution under sections 877 and 877.6, (1) the "consideration" paid by it must not be grossly disproportionate to its fair share of responsibility and (2) the remaining defendants are entitled to have the plaintiff's claims against them reduced by the amount of the consideration paid. Although plaintiffs may be less willing to enter into such agreements once they recognize that their claims against the nonsettling defendants will be reduced by the value of the agreement,[27] we do not believe that consequence can itself justify a contrary result. Offsets have been routinely required in normal settlement agreements since the inception of section 877, and we can find no justification for exempting the more questionable sliding scale agreements from similar treatment.

[26] Some out-of-state decisions have found such loan agreements invalid as violative of the common law doctrines of champerty and maintenance, which generally preclude a "stranger" to a lawsuit from financing the litigation in return for a portion of any recovery. (See, e.g., *Lum* v. *Stinnett, supra,* 87 Nev. 402 [488 P.2d 347].) California, however, has never adopted the common law doctrines of champerty and maintenance (see, e.g., *Estate of Cohen* (1944) 66 Cal.App.2d 450, 458 [152 P.2d 485]; *Cain* v. *Burns* (1955) 131 Cal.App.2d 439, 443 [280 P.2d 888]; *Muller* v. *Muller* (1962) 206 Cal.App.2d 731, 733 [23 Cal.Rptr. 900]), and thus the fact that a settlement takes the form of such a loan does not in itself render the settlement invalid.

[27] The rapid increase in the attractiveness of such agreements to plaintiffs in recent years may have been based, in large part, on the fact that prior decisions have permitted plaintiffs to receive the substantial benefits of sliding scale agreements without any corresponding reduction in their claims against the remaining defendants.

Moreover, as a result of our resolution of the issues presented in this case, defendants may also find such agreements less attractive in the future. The result of the offset requirement will be a reduction in the amount of exposure of a nonsettling defendant to the plaintiff by the amount of the settling parties' declaration of value, thereby increasing the odds that the settling defendant will be obligated to perform under its guaranty agreement with plaintiff. Thus, after trial, the obligation of the settling defendant to the plaintiff under the sliding scale agreement will now be the difference, if any, between the amount of total damages awarded against a nonsettling defendant, reduced by the valuation of the sliding scale agreement, and the guaranteed amount.

## B

Abbott further contends that the agreement at issue should be upheld because, at the time it was entered into, existing authority indicated that such a sliding scale agreement was a good faith settlement for purposes of sections 877 and 877.6. (See, e.g., *Burlington Northern R.R. Co.* v. *Superior Court* (1982) 137 Cal.App.3d 942 [187 Cal.Rptr. 376].) Although Abbott recognizes that the reasoning of *Burlington* was specifically disapproved in *Tech-Bilt* (38 Cal.3d at p. 500, fn. 7), it claims that it is unfair to deprive it of the benefits of a "good faith" determination on the basis of a subsequent interpretation of the good faith standard.

This claim is unfounded for a number of reasons. In the first place, at the time the agreements were formally signed there was already a conflict in Court of Appeal decisions interpreting the "good faith" standard, and a number of Court of Appeal decisions (*Torres* v. *Union Pacific R.R. Co., supra,* 157 Cal.App.3d 499; *River Garden Farms* v. *Superior Court, supra,* 26 Cal.App.3d 986) had enunciated the standard we ultimately endorsed in *Tech-Bilt.* Second, the terms of the sliding scale agreement in this case themselves make it quite clear that the parties entertained a serious question whether the agreement would be found to be in good faith; as we have seen, the agreement specifically provided that if it were found not in good faith, Abbott's insurer would pay plaintiffs $3 million outright. Finally, there would appear to be little reason, in any event, to deprive Ford and Sears of the protection which the statutory good faith standard was intended to afford them; they timely objected to the agreements at issue here, and the trial court sustained their objection. Even if Abbott reasonably relied on then-existing decisions in entering into the agreement, it appears that, at most, Abbott could simply seek to rescind its agreement with plaintiffs; of course, since the agreement in this case specifically contemplated that it might be found not in good faith and provided a remedy for that contingency, Abbott could not properly deprive plaintiffs of the benefit of that provision at this point. Accordingly, the earlier Court of Appeal decisions would provide no basis for Abbott to escape from the application of the proper good faith standard.

## V

In sum, we conclude: (1) that *Tech-Bilt's* good faith standard applies to sliding scale agreements, (2) that to satisfy the statutory objective of a fair apportionment of loss (i) the "consideration" paid by a defendant who enters into a sliding scale agreement must fall within the *Tech-Bilt* "ballpark" and (ii) the plaintiffs' claims against the remaining defendants must be reduced by the amount of the "consideration paid" by the settling de-

fendant, (3) that any unreasonable or bad faith conduct of the nonsettling defendants which impeded the settlement process and led to the sliding scale agreement may be taken into account in determining whether the agreement satisfies the "ballpark" standard, and (4) that any provision which purports to give a settling defendant a "veto" over subsequent settlements is valid only if it is limited to settlements which would leave the earlier settling defendant to bear more than its fair share of liability for the plaintiff's damages.

Although we ordinarily would have ordered the Court of Appeal to remand this matter to the trial court to permit it to reconsider its good-faith-settlement determination in light of the principles discussed above, no remand is necessary in light of the settlement of this litigation. (See fn. 8, *ante.*) The Court of Appeal opinion, which we ordered to remain published during the pendency of our review, is ordered depublished. Each party shall bear its own costs on appeal.

Lucas, C. J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.**—I concur in the majority opinion. I write separately to express one substantial reservation.

The majority opinion concludes: "Once the parties to the agreement have declared its value, a nonsettling defendant either (1) can accept that value and attempt to show that the settlement is not in good faith because the assigned value is not within the settling defendant's *Tech-Bilt* [38 Cal.3d 488] ballpark, or (2) can attempt to prove that the parties' assigned value is too low and that a greater reduction in plaintiff's claim against the remaining defendants is actually warranted." (Maj. opn., p. 879; see also p. 883, fn. 25; p. 885.)

I would prefer to delete the second alternative for several reasons. As the majority recognized in its footnote to the above quotation, the evaluation of a sliding scale agreement is a complex matter with the court able to do no more than make its best estimate. The second alternative provides a substantial danger that efforts to establish the proper value will require a minitrial with actuaries and economists testifying at length. And ordinarily the evaluation will not serve any legitimate purpose of the nonsettling defendant but will only result in delays.

In *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr 256, 698 P.2d 159], we adopted the "ballpark" rule after pointing out the numerous considerations which enter into the determination of a settlor's proportionate liability. (*Id.* at pp. 499-500.) The "ball-

park" rule is itself an attempt to make only a "rough approximation of plaintiffs' total recovery and the settlor's proportionate liability" modified by several considerations. (*Id.* at p. 499.) To evaluate a sliding scale agreement, we compare many of the same considerations to the amount of the guaranty and the likelihood that the guaranty will be reduced by recovery from a nonsettling defendant. Because we start with a "rough approximation," the further calculations become exceedingly complex with some discount allowed for the roughness of the approximation. Factoring the additional considerations mentioned in *Tech-Bilt* into the equation will be a substantial undertaking. We must bear in mind that in trying to roughly approximate the amount that the settling defendant will have to pay under his guarantee, we must determine the likely amount that the nonsettling defendant will have to pay which will be deducted in part or in toto from the guarantee.

In *Tech-Bilt* we were concerned that the pretrial settlement approval procedure would be converted into an extended minitrial. (*Id.* at p. 499.) While a trial judge could attempt to undertake the complex calculation of the estimate of the value of the sliding scale agreement on the basis of affidavits, I believe that most judges will want the experts before them, and we will have an extended minitrial.

It is not at all clear that any valid purpose is served by an extended inquiry to determine a rough estimate of value of the agreement once it is clear that the settlement figure is within the "ballpark." Plaintiff and the settling defendant should be permitted to settle within the "ballpark" with the settling defendant discharged on the claim for indemnity. The value placed on the agreement serves as an offset reducing damages recoverable from the nonsettling defendant, and the settling defendant and the plaintiff are directly affected by its amount. For this reason, we may expect that sliding scale agreements will contain a provision that the agreement is void not only if the court finds that the settlement figure furnished by the parties is less than the "ballpark" figure, but also if the court finds that the agreement is worth more than that figure. In either event we may expect that the settling parties will often come up with a new settlement. We may then have a second minitrial.

I would prefer that the second alternative be deleted.·

**MOSK. J.**—I dissent.

The majority opinion's central holding is as follows: The "good faith" required by Code of Civil Procedure section 877 (hereafter section 877) to relieve a defendant, settling under a sliding scale recovery agreement, from

liability for contribution or comparative equitable indemnity demands that the settling defendant pay an amount within the reasonable range of his proportional share of comparative liability for the plaintiff's injury. (*Ante,* at pp. 871-884.) As I shall explain, this holding is fundamentally unsound. Section 877 requires nothing more than that the plaintiff and the settling defendant simply refrain from collusive conduct intended to prejudice the interests of the nonsettling defendants. Accordingly, I would affirm the judgment of the Court of Appeal which correctly found such "good faith" as a matter of law on the facts of this case.

At the threshold I approve the majority's conclusion that sliding scale recovery agreements are subject to the "good faith" requirement. I also approve the conclusion that such agreements are not invalid as against public policy. There, however, my approval ends. I am of the opinion that both the language of section 877 and its history establish that the phrase "good faith" simply requires noncollusive conduct.

Chapter 1 of title 11 of part 2 of the Code of Civil Procedure, which is entitled "Releases From And Contribution Among Joint Tortfeasors," includes sections 875 through 880 of that code. The provisions of sections 877, 877.5, and 877.6 are set forth in the margin.[1]

---

[1] Section 877 provides as follows: "Where a release, dismissal with or without prejudice, or a covenant not to sue or not to enforce judgment is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—

"(a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater; and

"(b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors."

Section 877.5 provides as follows:

"(a) Where an agreement or covenant is made which provides for a sliding scale recovery agreement between one or more, but not all, alleged defendant tortfeasors and the plaintiff or plaintiffs:

"(1) The parties entering into any such agreement or covenant shall promptly inform the court in which the action is pending of the existence of the agreement or covenant and its terms and provisions; and

"(2) If the action is tried before a jury, and a defendant party to the agreement is a witness, the court shall, upon motion of a party, disclose to the jury the existence and content of the agreement or covenant, unless the court finds that such disclosure will create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

"The jury disclosure herein required shall be no more than necessary to be sure that the jury understands (1) the essential nature of the agreement, but not including the amount paid, or any contingency, and (2) the possibility that the agreement may bias the testimony of the alleged tortfeasor or tortfeasors who entered into the agreement.

"(b) As used in this section a 'sliding scale recovery agreement' means an agreement or covenant between a plaintiff or plaintiffs and one or more, but not all, alleged tortfeasor defendants, where the agreement limits the liability of the agreeing tortfeasor defendants to an amount which is dependent upon the amount of recovery which the plaintiff is able to recover

That the Legislature intended the phrase "good faith," which appears in the "substantive" section 877 and the "procedural" section 877.6, to refer simply to noncollusive conduct is suggested by the words themselves. "The phrase 'good faith' in common usage has a well-defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation." (*People* v. *Nunn* (1956) 46 Cal.2d 460, 468 [296 P.2d 813], citing authorities; accord, *Gunter* v. *City of Stockton* (1974) 43 Cal.App.3d 203, 211 [117 Cal.Rptr. 601]; *Appel* v. *Morford* (1943) 62 Cal.App.2d 36, 40 [144 P.2d 95].) There is nothing in the language of the statutory provisions that in any way supports an inference that the Legislature intended the phrase to bear a meaning other than that which it commonly bears.

from the nonagreeing defendant or defendants. This includes, but is not limited to, agreements within the scope of Section 877, and agreements in the form of a loan from the agreeing tortfeasor defendant to the plaintiff or plaintiffs which is repayable in 'whole or in part from the recovery against the nonagreeing tortfeasor defendant."

Section 877.6 provides as follows:

"(a) Any party to an action wherein it is alleged that two or more parties are joint tortfeasors shall be entitled to a hearing on the issue of the good faith of a settlement entered into by the plaintiff or other claimant and one or more alleged tortfeasors, upon giving notice thereof in the manner provided in Sections 1010 and 1011 at least 20 days before the hearing. In addition, the notice may be served by mail pursuant to Section 1012, but in those cases the period of notice shall be at least 25 days if the place of address is within the State of California, at least 30 days if the place of address is outside the State of California but within the United States, and at least 40 days if the place of address is outside the United States. Upon a showing of good cause, the court may shorten the time for giving the required notice to permit the determination of the issue to be made before the commencement of the trial of the action, or before the verdict or judgment if settlement is made after the trial has commenced.

"(b) The issue of the good faith of a settlement may be determined by the court on the basis of affidavits served with the notice of hearing, and any counteraffidavits filed in response thereto, or the court may, in its discretion, receive other evidence at the hearing.

"(c) A determination by the court that the settlement was made in good faith shall bar any other joint tortfeasor from any further claims against the settling tortfeasor for equitable comparative contribution, or partial or comparative indemnity, based on comparative negligence or comparative fault.

"(d) The party asserting the lack of good faith shall have the burden of proof on that issue.

"(e) When a determination of the good faith or lack of good faith of a settlement is made, any party aggrieved by the determination may petition the proper court to review the determination by writ of mandate. The petition for writ of mandate shall be filed within 20 days after service of written notice of the determination, or within such additional time not exceeding 20 days as the trial court may allow.

"(1) The court shall, within 30 days of the receipt of all materials to be filed by the parties, determine whether or not the court will hear the writ and notify the parties of its determination.

"(2) If the court grants a hearing on the writ, the hearing shall be given special precedence over all other civil matters on the calendar of the court except those matters to which equal or greater precedence on the calendar is granted by law.

"The running of any period of time after which an action would be subject to dismissal pursuant to Section 583 shall be tolled during the period of review of a determination pursuant to this subdivision."

That the Legislature intended the phrase "good faith" simply to require noncollusive conduct is established by the history of section 877.

At the 1955 Regular Session of the Legislature, the State Bar proposed legislation that dealt with contribution among joint tortfeasors—but *not* with the effect of a release given by the plaintiff to a settling defendant. (Macomber & Farley, *The State Bar's Legislative Program* (1955) 30 State Bar J. 29, 33-34; Third Progress Rep. to the Legis. by the Sen. Interim Com. on Judiciary, p. 52, 2 Appen. to Sen. J. (1955 Reg. Sess.) [hereafter Jud. Com. Third Prog. Rep.].) That proposal—evidently modeled on the 1939 Uniform Contribution Among Tortfeasors Act (12 West's U.Laws Ann. (1975) U. Contribution Among Tortfeasors Act (1955 rev. act) Hist. Note, pp. 57-59 [hereafter 12 U.L.A., U. Contrib. Act])—was incorporated in Senate Bill No. 412 (hereafter S.B. 412), and contained the source-provisions for Code of Civil Procedure sections 875, 876, 878, 879, and 880. The proposal, however, did *not* contain a source-provision for section 877.

The official explanation presented by the State Bar and adopted by the Senate Committee on Judiciary ran in relevant part as follows: "Under the common law there is no contribution between joint tortfeasors. One of several joint tortfeasors may be forced to pay the whole claim for the damages caused by them yet he may not recover from the others their pro rata share of the claim. California follows this rule. [Citations.] The purpose of this bill is to lessen the harshness of that doctrine.

"The ancient basis of the rigid rule against contribution in this type of case is the policy that the law should deny assistance to tortfeasors in adjusting losses among themselves because they are wrongdoers and the law should not aid wrongdoers. But this overemphasizes the supposed penal character of liability in tort; it ignores the general aim of the law for equal distribution of common burdens and of the right of recovery of contribution in various situations, e.g., among co-sureties. It ignores also the fact that most tort liability results from inadvertently caused damage and leads to the punishment of one wrongdoer by permitting another wrongdoer to profit at his expense." (Jud. Com. Third Prog. Rep., *supra,* p. 52.)

Several hearings on S.B. 412 were held before the Senate Committee on Judiciary. (Fourth Progress Rep. to the Legis. by the Sen. Interim Com. on Judiciary, Explanation to Interim Com., p. 129, 1 Appen. to Sen. J. (1957 Reg. Sess.) [hereafter Jud. Com. Fourth Prog. Rep.].) No objections were made to the principle of the bill. (*Ibid.*) Some suggestions, however, were made—including a suggestion that the bill should provide for the effect of a release given by the plaintiff to a settling defendant. (*Ibid.*) The bill was

finally referred to the Senate Interim Judiciary Committee for further study. (*Ibid.*)

At the 1957 Regular Session of the Legislature, the State Bar presented a modification of its 1955 proposal. (Mull & Farley, *1957 Legislative Program* (1957) 32 State Bar J. 13, 17; Jud. Com. Fourth Prog. Rep., *supra,* p. 129.) The modification dealt with release from liability for contribution as well as with contribution itself, and contained one relevant addition—the source-provision for section 877. Senate Bill No. 1510 (hereafter S.B. 1510) incorporated the modified proposal, and stated in pertinent part as follows:

"877. Where a release or a convenant not to sue or not to enforce judgment is given to one of two or more persons liable for the same tort—

"(a) It shall not discharge any other such tortfeasor from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release or the covenant, or in the amount of the consideration paid for it which ever is the greater; and

"(b) It shall discharge the tortfeasor to whom it is given from all liability for any contribution to any other tortfeasors." (Jud. Com. Fourth Prog. Rep., *supra,* p. 129.)

The model for proposed section 877 was evidently section 4 of the 1955 Revised Uniform Contribution Among Tortfeasors Act (hereafter the Uniform Act):

"When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons liable in tort for the same injury or the same wrongful death:

"(a) It does not discharge any of the other tortfeasors from liability for the injury or wrongful death unless its terms so provide; but it reduces the claim against the others to the extent of any amount stipulated by the release or the covenant, or in the amount of the consideration paid for it, whichever is the greater; and,

"(b) It discharges the tortfeasor to whom it is given from all liability for contribution to any other tortfeasor." (12 U.L.A., U. Contrib. Act, *supra,* § 4, p. 98.)

Section 4 was plainly the sole and immediate source of proposed section 877: section 877 parallels section 4 almost word for word, and research has not disclosed the existence of any other model. Indeed, as of January 22,

1957, the date on which S.B. 1510 was introduced (Jud. Com. Fourth Prog. Rep., *supra,* p. 128), no jurisdiction had yet adopted section 4 (12 U.L.A., U. Contrib. Act, *supra,* Table of Juris. Wherein Act Has Been Adopted, p. 57).

In its original form, proposed section 877 in S.B. 1510 differed in only one significant aspect from section 4 of the Uniform Act—it did *not* contain the phrase "in good faith" which appears in the latter. S.B. 1510 was subsequently amended in the Senate and the Assembly. (Jud. Com. Fourth Prog. Rep., *supra,* p. 131.) In the Assembly, the phrase in question was inserted after the word "given." (3 Assem.J. (1957 Reg. Sess.) p. 4716.) As a result of that amendment, proposed section 877 became virtually identical to section 4 of the Uniform Act.

The comment made by the National Conference of Commissioners on Uniform State Laws (hereafter National Conference of Commissioners) on subsection (b) of section 4 of the Uniform Act is pertinent here and runs in relevant part as follows.

"The 1939 Act provided, in Section 5, that a release of any tortfeasor should not release him from liability for contribution unless it expressly provided for a reduction 'to the extent of the pro rata share of the released tortfeasor' of the injured person's recoverable damages. This provision has been one of the chief causes for complaint where the Act has been adopted, and one of the main objections to its adoption.

"*The requirement that the release or covenant be given in good faith gives the court occasion to determine whether the transaction is collusive, and if so there is no discharge.*

"The idea underlying the 1939 provision was that the plaintiff should not be permitted to release one tortfeasor from his fair share of liability and mulct another instead, from motives of sympathy or spite, or because it might be easier to collect from one than from the other; and that the release from contribution affords too much opportunity for collusion between the plaintiff and the released tortfeasor against the one not released. Reports from the state where the Act is adopted appear to agree that it has accomplished nothing in preventing collusion. In most three-party cases two parties join hands against the third, and this occurs even when the case goes to trial against both defendants. 'Gentlemen's agreements' are still made among lawyers, and the formal release is not at all essential to them. If the plaintiff wishes to discriminate as to the defendants, the 1939 provision does not prevent him from doing so.

*"The effect of Section 5 of the 1939 Act has been to discourage settlements in joint tort cases, by making it impossible for one tortfeasor alone to take a release and close the file.* Plaintiff's attorneys are said to refuse to accept any release which contains the provision reducing the damages 'to the extent of the pro rata share of the released tortfeasor,' because they have no way of knowing what they are giving up. The 'pro rata share' cannot be determined in advance of judgment against the other tortfeasors. In many cases their chief reason for settling with one rather than another is that they hope to get more from the party with whom they do not settle. A provision for reduction in fixed amount will not protect the settling tortfeasor from contribution. No defendant wants to settle when he remains open to contribution in an uncertain amount, to be determined on the basis of a judgment against another in a suit to which he will not be a party. Some reports go so far as to say that the 1939 Act has made independent settlements impossible. Many of the complaints come from plaintiff's attorneys, who say that they can no longer settle cases with one tortfeasor. Such reports have reached other states, and have been responsible for a considerable part of the opposition to the 1939 Act. The New York Law Revision Commission has introduced a number of bills for contribution acts, and this objection has been the chief factor in defeating them.

*"It seems more important not to discourage settlements than to make an attempt of doubtful effectiveness to prevent discrimination by plaintiffs, or collusion in the suit. Accordingly the subsection provides that the release in good faith discharges the tortfeasor outright from all liability for contribution."* (12 U.L.A., U. Contrib. Act, *supra,* § 4, Comrs. Com. on subsec. (b), pp. 99-100, italics added.)

S.B. 1510 was passed as amended, and section 877 enacted in its present form. (Sen. Jud. Com. Fourth Prog. Rep., *supra,* pp. 131-133; Stats. 1957, ch. 1700, § 1, p. 3077.)

The foregoing history of section 877 establishes that the Legislature intended the phrase "good faith" simply to require noncollusive conduct. First, section 877 was directly modeled on section 4 of the Uniform Act. Second, in drafting section 4 the National Conference of Commissioners had as their express purpose the facilitation of settlement and accordingly expressly intended the phrase in question simply to require noncollusive conduct. (12 U.L.A., U. Contrib. Act, *supra,* § 4, Comrs. Com. on subsec. (b), pp. 99-100.) Third, it must be presumed that the Legislature shared the purpose and intent of the National Conference of Commissioners. It has been stated that the intention of the drafters of a uniform act becomes the intention of the legislature upon enactment. (*Layne-Minnesota Co.* v. *Regents of Univ. of Minn.* (1963) 123 N.W.2d 371 [Minn. 284, 290-291, fn.

13].) This rule is sound: that the legislature has adopted the words of a uniform act supports, if not compels, the conclusion that it has adopted as well the purpose and intent of those who drafted that act. There is no evidence even suggesting that the rule should not apply here.

That the Legislature intended the phrase "good faith" simply to require noncollusive conduct is confirmed by the history of section 877.6.

In *American Motorcycle Assn.* v. *Superior Court* (1978) 20 Cal.3d 578 [146 Cal.Rptr. 182, 578 P.2d 899], we held that under section 877 a "good faith" settlement discharges the settling defendant from liability not only for contribution but also for comparative equitable indemnity. (*Id.* at p. 604.)

In *Fisher* v. *Superior Court* (1980) 103 Cal.App.3d 434 [163 Cal.Rptr. 47], the court concluded that in order to further section 877's goal of encouraging settlements, "the issue of the good faith settlement between the plaintiff and the settling tortfeasor should be tried separately and in advance of the trial of the tort issues, and upon motion of any party to the action should be tried as soon after the settlement as the court's calendar permits." (*Id.* at pp. 438-439.)

The *Fisher* court also concluded: "Upon the trial of the 'good faith' settlement issue, the burden of proving that there has been a settlement is on the settlor who asserts that settlement as a bar to all claims for contribution or comparative (equitable) indemnity by any other tortfeasor. . . . Once there is a showing made by the settlor of a settlement, we are of the opinion that the burden of proof on the issue of 'good faith' shifts to the nonsettling tortfeasor who asserts the claim that the settlement was not made in good faith." (*Id.* at p. 447.)

The *Fisher* court explained its allocation of the burden of proof as to the issue of good faith in substance as follows: section 877—the court impliedly concluded—simply requires lack of wrongdoing on the part of the plaintiff and the settling defendant; Evidence Code section 520 provides that "The party claiming that a person is guilty of crime or wrongdoing has the burden of proof on that issue"; further, public policy encourages settlement and discourages needless litigation; therefore, the party attacking the "good faith" of a settlement bears the burden of proof on the issue. (*Id.* at pp. 448-449.)

In enacting section 877.6 (Stats. 1980, ch. 562, § 1, p. 1549; amended by Stats. 1984, ch. 311, § 1, p. 1551; Stats. 1985, ch. 621, § 2), the Legislature codified both *Fisher's* procedures for the determination of the issue whether

a settlement was in "good faith" within the meaning of section 877 and *American Motorcycle's* holding extending the bar raised by a "good faith" settlement to claims for comparative equitable indemnity. (Roberts, *The Good Faith Settlement: An Accommodation of Competing Goals* (1984) 17 Loyola L.A. L.Rev. 841, 867-869 [hereafter Roberts, *Good Faith Settlement*].)

Speaking of the intent underlying the statutory provision, Professor Florrie Young Roberts has stated: "[Section 877.6] had the same purpose as section 877, namely to encourage settlements by providing that a settlor would be free from future claims by his joint tortfeasors. The legislative history supports this conclusion. The bill's proponents stated: 'A procedural uncertainty under existing law had caused the loss of settlements in a substantial number of trial court cases . . . . [D]efendants contemplating settlement with the plaintiff are reluctant to risk vulnerability to a later jury trial in which a concurrent tortfeasor may claim that the settlement lacks "good faith." ' Unlike section 877, section 877.6 provided a cure for the finality problem by allowing a pretrial hearing to determine the issue of the 'good faith' of a settlement. Under this procedure the defendant is not discouraged from entering into a settlement with the plaintiff because of the fear he may be required later to litigate the issue of his liability if the issue of 'good faith' is decided against him. Thus, section 877.6 permits a defendant who wants to settle to know in advance whether this settlement is in 'good faith' and whether he will, therefore, be free from partial indemnity claims." (Roberts, *Good Faith Settlement, supra,* 17 Loyola L.A. L.Rev. at pp. 887-888, fns. omitted (quoting Assem. Judiciary Com., Bill Dig. Assem. Bill No. 3425, p. 2 (hg. Apr. 30, 1980) and citing Sen. Republican Caucus, Third Reading Analysis of Assem. Bill No. 3425, p. 2); accord, Note, *California's Sliding Scale Settlement Agreements—Finality Instead of Fairness* (1986) 23 San Diego L.Rev. 227, 231.)

Section 877.6 was also intended, as Professor Roberts has observed, to ease court congestion and limit complex trials. (Roberts, *Good Faith Settlement, supra,* 17 Loyola L.A. L.Rev. at pp. 890-891.) "The fact that settlements were discouraged under the procedural system before Code of Civil Procedure § 877.6 'contributed widely to metropolitan court congestion.' [Citation.] The Senate Judiciary Committee cited the *Fisher* case for the proposition that the legislation was needed to stop 'the needless proliferation of a great number of more complex trials.' " (*Id.* at p. 891, fn. 207; see Sen. Judiciary Com., Rep. on Assem. Bill No. 3425, p. 3 (analysis of Assem. Bill No. 3425 as amended May 7, 1980).)

The foregoing history of section 877.6 confirms that the Legislature intended the phrase "good faith"—which originally appeared in section 877

and was repeated in section 877.6—simply to require noncollusive conduct. No more and no less.

First, in enacting section 877.6 the Legislature codified *Fisher's* procedures, including the allocation of the burden of proof to the party attacking the good faith of the settlement in question. The *Fisher* court allocated the burden as it did because it read the phrase in question simply to require noncollusive conduct. (See 103 Cal.App.3d at pp. 448-449.) Thus, in codifying *Fisher's* allocation of the burden of proof, the Legislature must be presumed to have read the phrase similarly.

Second, in seeking to encourage settlements and to ease court congestion and limit complex trials, the Legislature must be presumed to have intended the phrase in question to impose a requirement that would, at the very least, not frustrate those goals. "Noncollusive conduct" is such a requirement.

As Professor Roberts has explained: "California Code of Civil Procedure section 877.6 provides for a pretrial hearing on the issue of 'good faith' to be conducted upon twenty days written notice. The hearing is similar to ones conducted in other law and motion matters, and the judge may in his discretion decide the issue based on affidavits and declarations. Thus, any definition of 'good faith' must be one that will allow the issue to be determined at a pretrial hearing." (Roberts, *Good Faith Settlement, supra,* 17 Loyola L.A. L.Rev. at p. 894, fns. omitted.)

Understood simply to require noncollusive conduct, the phrase in question "provides for an efficient and uncomplicated 'good faith' hearing. Because the only issue with respect to whether a settlement is made in 'good faith' is whether the parties acted in a tortious manner toward the nonsettling defendants, the nonsettling tortfeasors who wish to dispute the finding of 'good faith' will not have much evidence to present at the hearing." (*Id.* at p. 910.)

By contrast, as is admitted even by Professor Roberts, who herself construes the phrase in question as do the majority, "There is no doubt the utilization of a reasonable range test will complicate the 'good faith' settlement hearing. . . . . [T]his type of 'good faith' hearing takes longer to hear, takes more preparation by counsel, and is more complex than a hearing solely into the tortious conduct of the parties." (*Id.* at p. 932.)

In concluding that section 877 requires more of the parties to a sliding scale recovery agreement than simply noncollusion, the majority rely on the decision in *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates* (1985) 38 Cal.3d 488 [213 Cal.Rptr. 256, 698 P.2d 159]. The premise fundamental to the

analysis of both *Tech-Bilt* (38 Cal.3d at pp. 494-496) and the majority opinion (*ante*, at pp. 871-872) is that section 877 "ha[s] two major goals: the equitable sharing of costs among the parties at fault and the encouragement of settlements" (*id.* at p. 872). It is on this premise that their construction of the phrase "good faith" rests: since, they assume, section 877 serves "the equitable sharing of costs among the parties at fault" as well as "the encouragement of settlements," the phrase must be interpreted not simply to require that the plaintiff and the settling defendant refrain from collusive conduct intended to prejudice the interests of the nonsettling defendants, but also to require that the " 'amount of the settlement is within the reasonable range of the settling tortfeasor's proportional share of comparative liability for the plaintiff's injuries' " (maj. opn., *ante*, p. 873, italics deleted [quoting *Tech-Bilt, Inc.* v. *Woodward-Clyde & Associates, supra*, 38 Cal.3d at p. 499]).

Section 877, however, was *not* intended to further both the equitable sharing of costs among parties adjudged liable for the plaintiff's injury and the encouragement of settlements: it was intended rather to serve only the latter. The reasons that support this conclusion are as follows.

To begin with, it is undisputed that section 877 was indeed intended to encourage settlements. (E.g., Roberts, *Good Faith Settlement, supra*, 17 Loyola L.A. L.Rev. at pp. 883-884.) Both *Tech-Bilt* (38 Cal.3d at pp. 494-496) and the majority opinion (*ante*, pp. 871-872) recognize as much.

Moreover, there is nothing in the language of section 877 suggesting that it was intended to further the equitable sharing of costs among parties adjudged liable for the plaintiff's injury. Contrary to the majority's implication (*ante*, at pp. 872-873), subdivision (a) of section 877—declaring that a good faith settlement "shall reduce the claims against [the nonsettling defendants] in the amount stipulated by the release, the dismissal or the covenant, or in the amount of the consideration paid for it whichever is the greater"—does *not* establish that the provision serves equitable sharing as well as the encouragement of settlements. Rather, subdivision (a) reveals only a legislative intent to bar double recovery. (*De Cruz* v. *Reid* (1968) 69 Cal.2d 217, 225-226 [70 Cal.Rptr. 550, 444 P.2d 342].)

There is also nothing in the history of section 877 suggesting that it was intended to further the equitable sharing of costs among parties adjudged liable for the plaintiff's injury. It is true that the official explanation presented by the State Bar together with its 1955 legislative proposal and adopted by the Senate Committee on Judiciary for S.B. 412 (Jud. Com. Third Prog. Rep., *supra*, pp. 52-53)—and reprinted for S.B. 1510 in 1957 (Jud. Com. Fourth Prog. Rep., *supra*, pp. 130-131)—evidences the equitable-sharing

goal. That text, however, cannot be understood to refer in any way to what was to become section 877: the State Bar's 1955 legislative proposal dealt only with contribution among joint tortfeasors and not with release from contribution, and specifically did not contain a source-provision for section 877. Further, an intent to promote equitable sharing is plainly absent from the comment of the National Conference of Commissioners on section 4 of the Uniform Act. (12 U.L.A., U. Contrib. Act, *supra,* § 4, Commrs. Com., pp. 98-100.)

On the positive side, the language of section 877 and its history reveal that the Legislature intended to encourage settlements and not to promote equitable sharing among parties adjudged liable for the plaintiff's injury.

The statutory scheme codified in chapter 1 of title 11 of part 2 of the Code of Civil Procedure abrogrates the common law's rule that barred contribution—and thereby prevented equitable sharing—*postjudgment.* (Code Civ. Proc., §§ 875, 876, 878.) By dealing only with the situation that obtains "Where a money judgment has been rendered" (*id.,* § 875), the statutory scheme "leav[es] the common law anti-contribution rule to prevail before judgment." (*River Garden Farms, Inc.* v. *Superior Court* (1972) 26 Cal.App.3d 986, 999 [103 Cal.Rptr. 498]; accord, *Guy F. Atkinson Co.* v. *Consani* (1963) 223 Cal.App.2d 342, 344 [35 Cal.Rptr. 750]; *American Can Co.* v. *City & County of San Francisco* (1962) 202 Cal.App.2d 520, 523 [21 Cal.Rptr. 33]; see also Note, *Sliding Scale Agreements and the Good Faith Requirement of Settlement Negotiation* (1980) 12 Pacific L.J. 121, 126 ["The restriction of the right of contribution to judgment debtors meant an equitable allocation was not available to . . . [other] parties"].) It follows that since the Legislature failed to abrogate the common law rule, which prevents equitable sharing, insofar as that rule operates prejudgment, it must not have intended section 877—which expressly governs only releases given "before verdict or judgment"—to further equitable sharing.

The legislative history of section 877 confirms what the statutory scheme clearly implies—i.e., the provision was not intended to promote the goal of equitable sharing. As explained above, on the basis of all the available evidence it must be presumed that in enacting section 877 the Legislature had the same intent that the National Conference of Commissioners had in drafting section 4 of the Uniform Act. Contrary to what the *Tech-Bilt* court suggested (38 Cal.3d at p. 494 & fn. 4), the commissioners did *not* intend the provision to further equitable sharing and did *not* intend the phrase "good faith" to require anything more of the plaintiff and the settling defendant than that they simply refrain from collusive conduct intended to prejudice the interests of the nonsettling defendants.

As Chief Justice Bird explained in her dissenting opinion in *Tech-Bilt*: "Section 5 [of the 1939 version of the Uniform Act] provided that a settling tortfeasor was not released from liability unless the release provided that plaintiff's ultimate recovery would be reduced to the extent of the released tortfeasor's pro rata share of the damages.

"The commissioners noted that '[r]eports from the state where the Act is adopted appear to agree that [section 5] has accomplished nothing in preventing collusion.' [Citation.] Moreover, its effect 'has been to discourage settlements in joint tort cases, by making it impossible for one tortfeasor alone to take a release and close the file. Plaintiff's attorneys are said to refuse to accept any release which contains the provision reducing the damages . . . because they have no way of knowing what they are giving up.' [Citation.]

"Therefore, in 1955 the commissioners abandoned section 5 of the uniform act in favor of permitting release from contribution where the settlement is made in good faith. 'It seems more important not to discourage settlements than to make an attempt of doubtful effectiveness to prevent discrimination by plaintiffs, or collusion in the suit. Accordingly [section 4(b)] provides that the release in good faith discharges the tortfeasor outright from all liability for contribution.' [Citation.] *Thus, . . . the 1955 revisions to the uniform act represented a policy decision to encourage settlement. The commissioners abandoned as unworkable their earlier attempt to protect nonsettling parties from inequity other than that caused by collusive conduct.*" (38 Cal.3d at p. 504 (dis. opn. of Bird, C.J.), italics added.)

Even apart from what the language and history of section 877 reveal, it appears that the Legislature did not intend section 877 to further the goal of equitable sharing among parties adjudged liable for the plaintiff's injury. This is so because the Legislature could not reasonably have acted with such an intention: equitable sharing presupposes that the parties have in fact been adjudged liable; section 877, however, expressly governs releases given before liability has been determined.

The unsoundness of the construction of the phrase "good faith" that the majority opinion and *Tech-Bilt* have adopted is revealed by its consequences—which are plainly contrary to what the Legislature intended. If the phrase is read to require the settling defendant to pay an amount within the reasonable range of his proportional share of comparative liability for the plaintiff's injury, rather than simply to require the plaintiff and the settling defendant to refrain from collusive conduct intended to prejudice the interests of the nonsettling defendants, then the section 877.6 "good faith" hearing—as even Professor Roberts, who agrees with the broad con-

struction of the phrase, is compelled to admit (see Roberts, *Good Faith Settlement, supra,* 17 Loyola L.A. L.Rev. at pp. 910, 932)—is rendered more complex, thereby discouraging settlement and increasing court congestion and causing complex trials to proliferate.[2] Such consequences, however, are the very evils the Legislature sought to eradicate by enacting section 877.6.

The unsoundness of the broad construction of the phrase "good faith" is also suggested by the fact that the rule it implies conflicts with a fundamental principle of the common law. If the phrase is read in accord with the majority opinion and *Tech-Bilt,* then the statutory provision imposes on the plaintiff and the settling defendant the duty to protect the interests of third parties—the nonsettling defendants—whose interests are adverse to their own. It goes almost without saying that when, as here, parties are not bound by contract or by a special relationship, the common law is loath to impose a duty on one to protect the interests of the other. (See generally, e.g., Prosser & Keeton, The Law of Torts (5th ed. 1984) § 56, pp. 373-385.) The Legislature, of course, could abrogate the common law rule and impose such a duty. If it had intended to do so, however, it would likely have made its intention plain. It certainly did not make any such intention plain here.

Therefore, the fundamental premise shared by *Tech-Bilt* (38 Cal.3d at pp. 494-496) and the majority opinion (*ante,* pp. 871-872) is unsound: as explained above, section 877 was *not* intended to further the goal of equitable sharing of costs among parties adjudged liable for the plaintiff's injury.

---

[2] Contrary to *Tech-Bilt's* implication, the Legislature's enactment of section 877.6 does not affect the correctness of the "noncollusion" reading of the phrase "good faith." The relevant discussion in that opinion is as follows.

"The Legislature responded to *American Motorcycle* in 1980 by its enactment of section 877.6. That section codifies the *American Motorcycle* result by providing that a section 877 settlement bars claims for partial or comparative indemnity as well as for contribution. [Citation.] It also specifically reiterates the proviso that a settlement must be made in good faith before it will operate as a bar and clarifies the procedures for judicial determination of the good faith issue. [¶] This background strongly suggests that the Legislature intended the term 'good faith' in section 877.6 to bear the meaning ascribed to that term in section 877 by the Court of Appeal's decision in *River Garden Farms* and by this court in *American Motorcycle.*" (38 Cal.3d at p. 496.)

In enacting section 877.6, the Legislature codified both the procedure laid down in *Fisher* for the conduct of the "good faith" hearing (103 Cal.App.3d at pp. 438-449) and the substantive holding of *American Motorcycle,* to the effect that a "good faith" settlement bars claims for comparative equitable indemnity as well as contribution (20 Cal.3d at p. 604). In so doing, the Legislature cannot reasonably be presumed to have affirmed or adopted what *Tech-Bilt* asserts is the *American Motorcycle* court's implied approval of the broad construction of the phrase "good faith": there is no evidence that it even adverted to that aspect of the *American Motorcycle* opinion. The Legislature can, however, reasonably be presumed to have accepted the "noncollusion" reading of the phrase: in allocating the burden of proof to the party attacking the "good faith" of the settlement, the *Fisher* court relied on this reading (103 Cal.App.3d at pp. 447-449); in codifying that allocation in section 877.6, subdivision (d), the Legislature must have done the same.

For the foregoing reasons, I conclude that the "good faith" requirement of section 877 is satisfied if the plaintiff and the defendant settling under a sliding scale recovery agreement simply refrain from collusive conduct intended to prejudice the interests of the nonsettling defendants. Accordingly, I conclude that the central holding of the majority opinion—viz., the "good faith" requirement is satisfied only if the settling defendant pays an amount within the reasonable range of his proportional share of comparative liability for the plaintiff's injury—is fundamentally unsound. Therefore, I dissent.[3]

---

[3] I find the repeated use of the expression "in the ballpark" in both the majority and concurring opinions to be disturbing. While it may be accepted in current vernacular, I suggest it may puzzle the reader of this text 25 or 50 years from today. We are, of course, writing not merely for the moment but for future guidance of the bench and bar.

My colleagues lean on the use of that argot in the majority opinion in *Tech-Bilt*. While he did make passing reference to the "ballpark," Justice Grodin did not include that term in the actual *Tech-Bilt* test. Rather, he denominated the proposed rule as the " 'reasonable range' test." (38 Cal.3d at p. 500.) In my view, that phrase would be more readily understood than the sport-page idiom employed by the opinions in this case.